IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

THADDEUS JASON KAROW,

                Plaintiff,

  v.

SECURITY DIRECTOR FUCHS,
LT. MARTINSON and
SGT. ARMSTRONG,

                Defendant.

OPINION & ORDER

13-cv-798-jdp

Plaintiff Thaddeus Jason Karow, a Wisconsin Department of Corrections prisoner placed an advertisement in a newsletter for adherents of the Asatru religion, seeking help in getting his religion recognized as a religion separate from the Wicca "umbrella" group in Wisconsin prisons. He received a conduct report for placing that advertisement as well as for receiving a typewriter from an editor of the newsletter. Even after plaintiff was found not guilty at a disciplinary hearing, defendant prison officials believed that he was breaking prison rules by continuing the advertisement and told him they would give him further conduct reports.

Plaintiff brings claims that defendants retaliated against him for soliciting legal advice in the newsletter. Currently before the court are defendants' motion for summary judgment as well as plaintiff's motion for preliminary injunctive relief. After considering the parties' submissions, I will grant defendants' motion for summary judgment on plaintiff's claims for damages under the doctrine of qualified immunity, because there is no clearly established law showing that plaintiff's advertisement was protected by the First Amendment. Because

plaintiff has been transferred away from the prison at which the alleged retaliation occurred, his claims for injunctive and declaratory relief are moot.

## UNDISPUTED FACTS

I draw the following facts from the parties proposed findings and supporting evidence.

Plaintiff Thaddeus Jason Karow is currently an inmate at the Stanley Correctional Institution. Previously he was housed at the New Lisbon Correctional Institution (NLCI), and this case concerns events occurring while plaintiff was housed at NLCI. Plaintiff is an adherent of the Asatru religion. Defendants are Wisconsin Department of Corrections officials employed at NLCI: Larry Fuchs is the security director; Jason Armstrong is a correctional sergeant who at relevant times worked as the "property sergeant"; and Mathew Martinson is a lieutenant who acts as the property room supervisor and the "security threat group" coordinator.

"Security threat group" is the DOC's term for a gang, or "groups of individuals who threaten, coerce, or harass others and/or engage in or encourage illegal or illicit activities on the part of group members or others." Dkt. 36, at 3, ¶ 8. Martinson states that the DOC has often had problems with security threat groups attempting to take over religious groups or having a religious group become a cover for gang activity. In the past, white supremacist groups have infiltrated both Pagan and Christian religious groups, including at NLCI. Because religious services are one of the few opportunities for inmates to gather with others they choose to associate with, religious groups are "attractive venue[s] for members of gangs in prison to all be able to congregate together and conduct gang activities." Dkt. 36, at 5, ¶ 15.

On April 11, 2013, plaintiff received a typewriter that arrived in the mail. It was inventoried in the property room, and because it was received from a DOC-approved vendor, it was provided to plaintiff. About June 3, 2013, defendant Martinson was notified by property room staff that a newsletter from "Nordic Pathway Cultural Groups" titled "Rune Quest" (the May 2013 edition) arrived at the prison, addressed to plaintiff. Staff notified Martinson of this newsletter because it contained an article related to "The 88 Precepts," a concept utilized by white supremacy groups. According to Martinson, "[t]he number 88 is used by neo-Nazis to represent 'Hail Hitler' since 'H' is the eighth letter of the alphabet." Dkt. 36, at 11, ¶ 34. White supremacy groups are considered a security threat group, even if there are religious components to the group. Material related to "The 88 Precepts" and security threat groups is not allowed and is considered contraband.

Staff also notified Martinson that the newsletter contained an advertisement from plaintiff stating:

> Help! get Asatru recognized in the WI prison system As a legitimate religion, separate from Wicca. If you have any ideas please contact: Thaddeus J. Karow #191554 c/o Box 4000 – New Lisbon, WI 53950

*Id.* at 11, ¶ 33.[1]

An NLCI property officer completed a form indicating that the newsletter would not be delivered to plaintiff because it contained contraband. Martinson called plaintiff to the property room to discuss the newsletter. The parties disagree about the scope of that

---

[1] The Wisconsin Department of Corrections has created "'Umbrella Religious Groups' designed to allow inmates to congregate with those who share relatively similar beliefs. . . . The existing umbrella groups are Protestant, Islam, Native American, Catholic, Jewish, Eastern Religions, and Pagan." *Kaufman v. Pugh*, 733 F.3d 692, 695 (7th Cir. 2013). I understand the parties to agree that adherents of the Asatru religion are part of the DOC's Pagan group, also called the Wicca group.

conversation. Martinson states that he told plaintiff the newsletter was denied because it contained contraband, contained an unauthorized advertisement that was in violation of Wis. Admin. Code § DOC 303.20 ("Group resistance and petitions"),[2] and was not mailed from an approved location. Martinson also states that he explained to plaintiff the proper way to solicit other inmates to work together to form a religious group, which was following the procedures outlined in Wis. Admin. Code §§ DOC 309.365 ("Inmate activity groups")[3]

---

[2] This provision was renumbered to § DOC 303.24 in December 2014 and amended slightly, (as have some of the other rules mentioned in this opinion) but I will refer to the rules as they appeared and were numbered at the time of the events in question. Section DOC 303.20 stated:

> (1) Any inmate who participates in any group activity which is not approved under s. DOC 309.365 or is contrary to provisions of this chapter is guilty of an offense.
> (2) Any inmate who joins in or solicits another to join in any group petition or statement is guilty of an offense, except that the following activities are not prohibited:
> (a) Group complaints in the inmate complaint review system.
> (b) Group petitions to courts.
> (c) Authorized activity by groups approved by the warden under s. DOC 309.365 or legitimate activities required to submit a request under s. DOC 309.365 (3) or (4).
> (d) Group petitions to government bodies, legislators, courts or newspapers.
> (3) Any inmate who participates in any activity with an inmate gang, as defined in s. DOC 303.02 (11), or possesses any gang literature, creed, symbols or symbolisms is guilty of an offense. An inmate's possession of gang literature, creed symbols or symbolism is an act which shows that the inmate violates the rule. Institution staff may determine on a case by case basis what constitutes an unsanctioned group activity.

[3] Under this provision, "no group of inmates may refer to itself by a collective name, conduct meetings or engage in any organized activity which promotes identification with a particular group unless the group has been approved by the superintendent." Wis. Admin. Code § DOC 309.365(2). There is an exception for inmates seeking to "formulate a request for approval as an activity group," but even then, the "group of inmates or an inmate on behalf of a group may submit a written request to the superintendent for permission to engage in

and 309.61 ("Religious beliefs and practice").[4] Plaintiff states that Martinson told him only that his advertisement was not authorized. Plaintiff also states that in November 2012, he filed a formal request for new religious practice, but it was denied (although he does not say he told Martinson this during this conversation). Dkt. 35, at 6, ¶¶ 27-28, Dkt. 35-9, and Dkt. 35-10.

Rune Quest is at least in part directed towards confined persons; the edition mailed to plaintiff specifically includes in its "Folk Profiles" section profiles for other inmate followers, including inmates in Wisconsin. Dkt. 28-2, at 12. Martinson was also aware that other inmates at NLCI received the newsletter. Therefore, it was clear to Martinson that the advertisement placed by plaintiff was directed at least in part to other inmates.

In late June and early July 2013, plaintiff received two letters from a civil detainee named Benjamin Alverson, one of the editors of Rune Quest. Alverson's envelopes contained a "three triangle" symbol, which is symbol often used by white supremacy groups. Alverson is involuntarily confined in a sex offender treatment facility in Minnesota. The correspondence from Alverson and the newsletter make clear that Alverson donated the typewriter to plaintiff.

Martinson believed there were grounds for a conduct report against plaintiff. On July 11, 2013, he placed plaintiff on temporary lockup status pending an investigation into violations of prison rules. After his investigation, Martinson believed that plaintiff had

---

organizational activities necessary to formulate [that] request." Section DOC 309.365(3).

[4] This provision states in part that "[a]n inmate who wants to participate in religious practices that involve others or that affect the inmate's appearance or institution routines shall submit a written request to the superintendent for permission to participate in specific religious practices." Wis. Admin. Code § DOC 309.61(2)(a).

violated Wis. Admin. Code §§ DOC 303.20 and DOC 303.32 ("Enterprises and fraud").[5]

Martinson's conduct report stated:

> On July 11, 2013 it was discovered while reviewing a letter addressed to Inmate Karow, Thaddius #191554 that he had a typewriter in his possession that was purchased for him by Nordic Pathways Cultural Groups that is operated out of the Minnesota Sex Offender Treatment Facility in Moose Lake, MN. Upon interviewing Inmate Karow about who purchased the typewriter for him, he stated that his friend Benjamin Alverson had purchased it for him. Through further investigation it has been determined that Mr. Alverson is a patient at the treatment facility, and he is also the editor of a newsletter that he created with a couple other patients at the treatment facility called "Rune Quest". On page 2 of the May 2013 Rune Quest Newsletter it states that Inmate Karow had requested that Alverson assist him with supplies for him to help him fight to get the Asatru religion recognized. In response to Inmate Karows request Mr. Alverson purchased a typewriter for Inmate Karow with the agreement that Inmate Karow continue to make donations to Mr. Alverson and the Nordic Pathways Cultural Group. Inmate Karow has placed an ad in the back page of the newsletter to attempt to solicit others to contact him at New Lisbon Correctional Institution to attempt to get the Asatru recognized as a religion separate from the Wicca religion. This is an unsanctioned group activity since the Wisconsin Department of Corrections has an authorized procedure to follow to request a new religious practice. Contraband accompanies this report.

Dkt. 36, at 21, ¶ 50. The newsletter, Alverson's letter, and the typewriter were held in the

property room pending the disciplinary hearing.

As security director, defendant Fuchs reviews all conduct reports written to inmates

and he determines whether they should proceed, be dismissed or be returned for

investigation. Fuchs determined the conduct report should proceed.

---

[5] That provision states in part that "[a]ny inmate who offers to buy or orders any item with the intention of not paying for it or buys it on credit is guilty of an offense." Wis. Admin. Code § DOC 303.32(2).

On July 31, 2013, a disciplinary hearing was held before adjustment committee members Lt. Rahlf and Mr. Thyne. The committee relied on the statement in the conduct report, the items held as contraband, as well as a statement submitted by plaintiff. The committee found plaintiff not guilty of violating the rules about group petitions or enterprises, stating in part:

> Based on our conclusions regarding the testimony, the physical evidence and reasonable inferences drawn from these factors, we find it more likely than not, the accused did not violate DOC 303.20(1) when he participated in an approved religious group under the Wicca Religious Umbrella Group and did not violate DOC 303.32 as the Hearing Committee could not prove beyond a reasonable doubt the inmate offered to buy or order any item with the intention of not paying for it.

*Id*. at 23, ¶ 58. The committee also ordered the typewriter and letters to be returned to plaintiff.

Defendants Martinson and Fuchs discussed the decision and agreed that it was incorrect. Martinson believed the hearing committee "missed the STG connection" in the newsletter and "missed the fact that any groups—including religious groups—must be approved by the warden, and the group plaintiff was soliciting was not yet approved by the warden." *Id*. at 24, ¶ 60. (Plaintiff attempts to dispute these findings by stating they are "conclusory," but that is incorrect. Defendants are free to relate what they discussed and believed about the ruling.)

Around the same time, plaintiff had filed an inmate grievance about the rejection of the items. On July 31, 2013, the institution complaint examiner recommended that the grievance be affirmed, based on the dismissal of plaintiff's conduct report. On August 12, 2013, the warden affirmed the recommendation.

On August 16, 2013, defendant Martinson called plaintiff to the property to room to return his typewriter. Martinson states that during their conversation, plaintiff mentioned that his typewriter was actually a religious donation. This type of donation to an individual, as opposed to the institution as a whole, is not permitted under prison rules. Plaintiff states he never told Martinson this.[6] Martinson continued to withhold the typewriter. Martinson says he did this because of the new information he learned from his conversation with plaintiff.

On August 22, 2013, plaintiff filed a new grievance about the denial of his property. The institution complaint examiner consulted with Martinson and the warden. The warden determined that plaintiff could have the typewriter. The next day, plaintiff received the typewriter. Plaintiff agreed to destroy his copy of Rune Quest and withdraw his complaint. The grievance was rejected as moot.

About September 7, 2013, defendant Martinson called plaintiff to the property room. Martinson told plaintiff that his advertisement that continued to appear in Rune Quest was still a violation of Wis. Admin. Code § DOC 303.20. Even though the hearing committee found him not guilty in the prior conduct report, Martinson believed this was because his conduct report was not clearly written and he did not reference the specific provision of § DOC 303.20 he believed plaintiff violated. Martinson says that plaintiff would receive another conduct report unless he followed the proper procedure for getting approval to place the advertisement. Plaintiff says that Martinson did not give him any advice about the proper procedure. Rather, Martinson told him that if he did not remove the advertisement, he would

---

[6] Defendants argue that plaintiff's attempt to dispute this finding is not directly on point with their proposed finding, but granting all inferences in plaintiff's favor, I conclude that he adequately disputes what was said in their conversation.

receive another conduct report, and that Martinson would "personally make sure [plaintiff] was found guilty this time around" and that he would "receive[] the maximum punishment." Dkt. 35, at 4, ¶ 17.

Sometime in September 2013, defendant Armstrong called plaintiff to the property room to receive the newsletter, which was ordered returned by the disciplinary hearing members. (It is unclear how this relates to the parties' earlier proposed finding that plaintiff agreed to destroy the newsletter.) Armstrong told plaintiff that Martinson was going to give him another conduct report if the advertisement appeared in another issue of Rune Quest. The parties dispute whether Armstrong explained to plaintiff what he believed to be the proper way to get approval for such an advertisement.

The parties agree that around this time, another issue of Rune Quest arrived for plaintiff, containing the same advertisement. However, by this time, plaintiff had agreed to discontinue the advertisement, so Armstrong did not give plaintiff a conduct report. Armstrong allowed plaintiff to have a copy of the new issue because Rune Quest was not included on the DOC-wide banned publications list, and property staff did not discover any "security threat group" references in that issue.

On October 1, 2013, plaintiff filed a grievance, alleging that Martinson was retaliating against him for submitting his advertisement. The institution complaint examiner recommended dismissing the grievance because "by no means does it mean Lt. Martinson has retaliated against Inmate Karow in any way simply due to the fact the conduct report he had written was dismissed." Dkt. 36, at 38-39, ¶ 87. The warden affirmed the dismissal.

On January 31, 2014, at the DOC Security Threat Groups coordinator meeting, Chair Steven Schueler, addressed Rune Quest. I understand Martinson to be saying that he was

9

present at this meeting. The meeting minutes note, "This was a white supremacist type publication that was being sent out by inmates at the Minnesota equivalent to Wisconsin's Sand Ridge. Steve contacted the management there and we should not being seeing at the institutions any more. Let Steve know if you do." I take this to mean that Rune Quest is now prohibited in Wisconsin prisons.

ANALYSIS

**A.  Preliminary injunctive relief**

In his motion for preliminary injunctive relief, plaintiff argues that he "was still under [defendant] Martinson's threat of punishment if plaintiff attempts to place any advertisements that seek assistance in filing out grievances." Dkt. 19, at 2. He also argued that he faced an imminent retaliatory transfer to a new prison, motivated by retaliatory animus. Plaintiff was indeed transferred to the Stanley Correctional Institution shortly after he filed his PI motion, so at this point I understand his request for one to be transferred back to NLCI.

Under the Prison Litigation Reform Act, preliminary injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2); *see also Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012) (noting the PLRA "enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: prison officials have broad administrative and discretionary authority over the institutions they manage") (internal quotation marks and citations omitted).

10

Plaintiff falls far short of showing that any preliminary injunctive relief is appropriate in this case. The ultimate decision for transfer was made by prison staff members who are not defendants in this case (defendant Security Director Fuchs was only "consulted" on the decision, *see* Dkt. 23-1, at 4), and plaintiff has not amended his complaint to include these officials as defendants. Nor does plaintiff explain the connection between his advertisement and the transfer, such that one could reasonably say the transfer is related to the facts of this case. *See, e.g.*, *Wilson v. Gaetz*, 2015 WL 4999852, at *2 (S.D. Ill. Aug. 21, 2015) ("It is well-established that preliminary injunctive relief must relate to the claims pending in the underlying lawsuit."). Plaintiff has failed to persuade me that the drastic option of a court-ordered transfer back to NLCI would be appropriate under § 3626(a)(2). If plaintiff believes that he was transferred for retaliatory reasons, he will have to bring that claim in a new case.

As far as plaintiff's concern about Martinson continuing to retaliate against him, his transfer has removed him from Martinson's control. Plaintiff's current ability to place an advertisement in Rune Quest appears to be circumscribed by Steven Schueler's banning of the newsletter, but Schueler is not a defendant in this case either. Accordingly, I will deny plaintiff's motion for preliminary injunctive relief.

## B.  Summary judgment standard of review

Summary judgment is appropriate if the moving party, here defendants, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, plaintiff "must set forth specific facts showing that there is a genuine issue for

11

trial." *Id*. He may not simply rely on the allegations in his pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [his] favor." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996) (citations omitted).

## C. Retaliation

Plaintiff alleges that defendants punished him for placing his advertisement in Rune Quest and continued to punish him and threaten him with further punishment even after he was found not guilty at his disciplinary hearing. To succeed on a retaliation claim, plaintiff must establish that: (1) he engaged in activity protected by the First Amendment; (2) defendants took actions that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) the First Amendment activity was at least a "motivating factor" in defendants' decisions to take those actions. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).

The major issue in dispute here is whether plaintiff's placement of the advertisement in *Rune Quest* was protected speech.[7] An inmate is not stripped of all his First Amendment rights upon incarceration. Rather, he retains "those first amendment rights that are not inconsistent with his status as a prisoner." *Rios v. Lane*, 812 F.2d 1032, 1036 (7th Cir. 1987). The question whether a prisoner's speech is protected is governed by the standard established in *Turner v. Safley*, 482 U.S. 78, 89 (1987), under which a prison regulation that impinges on prisoners' constitutional rights is valid if "reasonably related to legitimate penological interests." In applying the *Turner* standard to a First Amendment retaliation claim, courts

---

[7] Although plaintiff had other correspondence with Alverson, I do not understand plaintiff to be saying that defendants retaliated against him for those communications.

examine whether the prisoner engaged in speech in a manner consistent with legitimate penological interests. *See Bridges*, 557 F.3d at 551.

The *Turner* Court set forth four factors to be used in evaluating whether this legitimate penological interests test is satisfied: (1) whether a valid, rational connection exists between the restriction and a legitimate governmental interest; (2) whether the prisoner has available alternative means of exercising the right in question; (3) whether accommodation of the asserted right will have negative effects on guards, inmates or prison resources; and (4) whether there are obvious, easy alternatives to the restriction showing that the current restriction was an exaggerated response to the penological concerns. *Turner*, 482 U.S. at 89-91. In applying this test, court must give "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

This case is a close one. The advertisement, on its face, is not obviously a security concern. Plaintiff asks for ideas from his fellow Asatru practitioners for ways to achieve recognition of their religion as a separate "umbrella" group. Perhaps the biggest single point in plaintiff's favor is that the disciplinary committee found him not guilty in his disciplinary hearing, which suggests that prison officials themselves do not believe that a legitimate governmental interest is served by restricting plaintiff's advertisement. It also raises the inference that defendants, through their further warnings to plaintiff, were not motivated by rational penological interests, as those interests were established by the institution.

However, the disciplinary committee's decision is not the final word on what constitutes protected speech. As I stated in the court's order screening plaintiff's complaint,

13

> It is difficult to understand exactly what the disciplinary committee meant when it said that plaintiff did not violate the group resistance regulation "when he participated in an approved religious group." I would not characterize plaintiff's correspondence with Alverson or his advertisement as "participation" in his religion, but rather an attempt to communicate with fellow members of the Asatru religion about the best way to improve the faith's status in Wisconsin prisons.

Dkt. 11, at 6 n.4. Although the parties disagree about the function of the advertisement, even plaintiff's characterization of the advertisement is as a request for *legal* help about his religion, as opposed to a form of religious practice. *See* Dkt. 33 (plaintiff's characterizing his First Amendment rights at issue as the right to advertise, right to solicit legal help, and right to file grievances and lawsuits). Inmate-to-inmate correspondence involving legal advice is subject to the same *Turner* analysis as any other prisoner communication. *Shaw v. Murphy*, 532 U.S. 223, 228 (2001). In addition, defendants argue that the committee would have come to a different conclusion had the original conduct report laid out defendants' case better. This is supported by the DOC's eventual banning of Rune Quest, which clearly suggests that the DOC would no longer approve of plaintiff submitting advertisements to it.

Defendants frame the advertisement differently than plaintiff, arguing that it is a call for imprisoned Asatru adherents to "come together." Dkt. 32, at 11. Prison security is obviously a legitimate penological interest, and defendants' invocation of this interest in restricting the advertisement is at least rational, given the white-supremacist material in the newsletter and longstanding threats regarding infiltration of religious groups noted by defendant Martinson.

Even if the first *Turner* factor is resolved in defendants' favor, the remaining factors are not fully addressed by the parties. Without knowing more about the alternative types of communication open to plaintiff or the alternative types of restrictions available to

defendant, I am reluctant to conclude as a matter of law that plaintiff's speech was not protected, or that no reasonable jury could conclude that defendants retaliated against plaintiff.

However, even if I assume that plaintiff's solicitation was indeed protected speech under *Turner*, I would dismiss his claims for damages under the defense of qualified immunity. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

In deciding whether a right is "clearly established," courts ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). A plaintiff bears the burden of establishing that the constitutional right was clearly established. *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013). Although the plaintiff need not point to a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 131 S.Ct. 2074, 2083 (2011). "In other words, 'the plaintiff must demonstrate either that a court has upheld the purported right in a case factually similar to the one under review, or that the alleged misconduct constituted an obvious violation of a constitutional right.'" *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015) (quoting *Lunini v. Grayeb*, 395 F.3d 761, 769 (7th Cir. 2005)).

I conclude that plaintiff fails to show a clearly established constitutional right to send his advertisement to other prisoners. Plaintiff does not present a closely analogous case, nor does my research reveal one. In particular, plaintiff cites *George v. Smith*, 507 F. 3d 605 (7th

15

Cir. 2007), for the proposition that prisoners' advertisements are protected by the First Amendment, but the *George* court actually noted that such communications can be limited depending on the type of message a prisoner wishes to send:

> George maintains that the prison has refused to allow him to speak to the public at large by placing advertisements in newspapers. That advertisements can be protected speech is clear. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). But what did George want to say? An advertisement calling on the public to elect a Governor who will pardon or parole prisoners would be protected; an advertisement offering to rent a helicopter for an escape would not. An ad proposing a commercial transaction (for example: "like-new atlas for sale") would be protected speech by a member of the general public, *see Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), but prisons are entitled to control their charges' economic lives, which likely includes an entitlement to control want ads and postings on eBay—if only to prevent prisoners from scamming the public. Neither the complaint nor any of George's other filings tells us whether the advertisements would have contained political commentary, lonely-heart announcements (another potential source of scams), or offers to acquire contraband.

*Id*. at 609.

Likewise, plaintiff cites cases for the propositions that inmates "have the right to pursue administrative grievances and lawsuits that challenge prison religious policies" and "the right to assist each other" in doing so. Dkt. 33, at 6, 14 (citing *Johnson v. Avery*, 393 U.S. 483, 490 (1969); *Lindell v. O'Donnell*, 2005 U.S. Dist. LEXIS 24767; *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002)). These propositions are true, as far as they go, but they do not suggest that these rights are completely unfettered from prison regulations consistent with *Turner*, particularly where the publication in which the prisoner seeks help raises gang-related concerns. *See Johnson*, 393 U.S. at 490 ("the State may impose reasonable restrictions and restraints upon the acknowledged propensity of prisoners to abuse both the giving and

16

the seeking of assistance in the preparation of applications for relief"); *see also Shaw*, 532 U.S. at 228.

Although further factual development would likely be necessary to show whether plaintiff's advertisement was truly protected speech, the scope of the right with regard to this type of communication—where a prisoner's right to pursue legal advice intersects with prison officials' concerns about unauthorized group activity—is not clearly established. This is the type of scenario that qualified immunity was meant to protect against. *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) ("Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties."); *see also Kikumura v. Turner*, 28 F.3d 592, 597 (7th Cir. 1994) ("[T]he point of qualified immunity and its 'clearly established' requirement is that government officials are not, as a rule, liable for damages in close cases."). Therefore, defendants' motion for summary judgment must be granted as it pertains to plaintiff's claim for damages.

My ruling on qualified immunity does not extinguish plaintiff's claims for injunctive or declaratory relief. *See Volkman*, 736 F.3d at 1091 (7th Cir. 2013). In his complaint, plaintiff seeks injunctive relief keeping defendants from hindering his efforts to advertise for legal service, as well as declaratory relief. However, as stated above, plaintiff has already been transferred to another prison, where it does not appear that defendants have any control over his communications. Because his requests for injunctive and declaratory relief are moot, I will grant defendants' motion for summary judgment on those claims. *See Ortiz v. Downey*, 561 F.3d 664, 668 (7th Cir. 2009).

ORDER

IT IS ORDERED that:

1.  Plaintiff Thaddeus Jason Karow's motion for preliminary injunctive relief, Dkt. 18, is DENIED.

2.  Defendants' motion for summary judgment, Dkt. 26, is GRANTED.

3.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered September 29, 2015.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

18